Michael W. Homer (#1535)
Jesse C. Trentadue (#4961)
***S**UITTER **A**XLAND**, PLLC**
8 East Broadway, Suite 200
Salt Lake City, UT  84111
Telephone: (801) 532-7300
Facsimile: (801) 532-7355
mhomer@sautah.com
jesse32@sautah.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ANTHONY CHARLES MURPHY,<br><br>    Plaintiff,<br><br>v.<br><br>STG. D. ROBERTS; LT. TRAVIS GIVENS,<br><br>    Defendants. | **DECLARATION OF<br>DANIEL ROBERTS**<br><br>Case No. 2:19-cv-00852-JNP<br><br>Judge Jill N. Parrish |

I, Daniel Roberts, hereby submit this *Declaration* as part of the court-ordered *Martinez Report* in this case:

1.  I am a named defendant in the above captioned matter and this *Declaration* is based upon my personal knowledge.

1.  At all relevant times, I was a Duchesne County Deputy Sheriff assigned to work as a corrections officer in the Duchesne County Jail ("Jail").

2.  With respect to this case, my involvement with Anthony Charles Murphy ("Murphy") consisted of two encounters.

3.  The first encounter occurred on July 17, 2019, when I was conducting a security

check of F-Block where Murphy and about 20 other inmates were being housed.

4. As a result of that security check, I discovered that some of the Jail inmates were storing food items that they had saved from their meals, which for health and safety reasons is not allow by Jail policy.

5. I was in F-Block to remind the inmates housed in that unit of the Jail's policy against keeping food from meals in their cells.

6. When I entered F-Block, I had the Jail's control center announce over the public address system that all of the inmates in F-Block were to leave their cells and assemble in the common area.

7. The inmates complied, including Murphy and an inmate named Clark.

8. Once the inmates were assembled in the F-Block common area, I informed them about the Jail policy against saving food.

9. As I started to leave, I heard inmate Clark say that: "This is a fucking joke and bullshit."

10. I was giving Clark a verbal warning about his comments to me when Murphy became agitated and argumentative and told me that: "you can't come in here and fucking disrespect me like that."

11. At that time, there were no other corrections officers present in F-Block to support me if I needed help controlling the situation.

12. Concerned that Clark and Murphy's open contempt for my authority might be contagious and ignite some sort of incident, I ordered all of the inmates to return to their cells.

13. Once they were in their cells, I radioed the Jail's control center to lock the doors to their cells.

14. Later, after reviewing the video of this incident that was recorded on the security cameras in F-Block, I charged both Murphy and Clark with disorderly conduct and reckless endangerment in violation of Jail Policy B14.

15. I prepared a *Report* of this incident, and a copy has been included as Exhibit D in the *Appendix* of exhibits submitted in support of the court-ordered *Martinez Report*.

16. Because Murphy did not have any prior disciplinary write-ups, I treated this as a minor disciplinary matter under the Jail's *Minor Disciplinary Policy*, a copy of which is included as Exhibit C in the *Appendix* of exhibits submitted in support of the court-ordered *Martinez Report*.

17. As a sanction, I moved Murphy out of the Jail's general population to H-Block, and told him that he would be restricted to his cell for three days and lose his DVD privileges whereby he would no longer be permitted to possess a DVD player in his cell to watch movies.

18. I imposed the same sanctions upon inmate Clark.

19. I transferred Murphy and Clark to H-Block and placed them in separate cells.

20. I transferred them to H-Block because it is used to house inmates being disciplined for violation of Jail policies, there are security cameras in each cell and the cell doors have larger glass panels whereby correction officers can more easily observe/monitor the inmate's behavior to prevent them from harming themselves.

21. The sanctions that I imposed upon Murphy were authorized by the Jail's *Minor Disciplinary Policy* and they did not add to or otherwise affect his term of incarceration for the crimes for which he was convicted and sentenced.

22. Because this incident was handled under the Jail's *Minor Disciplinary Policy*, the videotape of the incident in F-Block was not preserved.

23. My second encounter with Murphy occurred as a result of my duties as the Jail's Inmate Disciplinary Hearing Officer.

24. As the Jail's Inmate Disciplinary Hearing Officer, my duties are quasi-judicial in nature in that I adjudicate major disciplinary charges that have been brought against Jail inmates.

25. A record of my training is included as Exhibit T in the *Appendix* submitted in support of the court-ordered *Martinez Report* and the training that I have received relative to inmate discipline is highlighted.

26. Part of the training that I received to become an Inmate Disciplinary Hearing Officer included avoiding conflicts of interest such as presiding over a matter in which I had played a role, either directly or indirectly, by charging the inmate or having participated in the investigation that resulted in the bringing of disciplinary charges against that particular inmate.

27. Once Murphy had served his three-day confinement sanction in H-Block, he was moved back to F-Block where, on July 25, 2019, he engaged in a fight with another F-Block inmate, Melvin Whipple.

28. That fight was recorded on the security camera in F-Block, and because of the seriousness of the incident, which eventually resulted in both participants being charged with a major disciplinary infraction, that videotape was preserved.

29. As a consequence of that fight, Deputy Megan Arias investigated, collected evidence and formally charged both Murphy and Whipple with having violated Jail Policy B02, which prohibited fighting.

30. As the Inmate Disciplinary Hearing Officer, I was tasked with deciding the charges that had been brought by Deputy Arias against Murphy and Whipple.

31. In the prosecution of the charges that she had filed against Murphy, Deputy Arias

4

submitted the reports that officers had filed concerning the fight, photographs showing the injuries sustained by the participants as well as the fight scene and, most importantly, the videotape of the fight.

32. With the exception of the videotape of the fight which does not have sound and has been conventionally filed of record in this case as ECF-29, the other evidence submitted by Deputy Arias in the prosecution of the charges against Murphy appear as Exhibits E through I and P of the *Appendix* to the court-ordered *Martinez Report*.

33. On August 7, 2019, I heard the charge of fighting that had been filed by Deputy Arias against Murphy.

34. Murphy was present at that hearing, I read the charges against him and recorded his "not guilty plea."

35. I presented the evidence that Deputy Arias had gathered to Murphy and asked him for his response, including receiving the documents that he submitted in defense consisting of several pages from an article supposedly written by a Professor Kyle Hancock on self-defense and Murphy's handwritten statement about his fight with inmate Melvin Whipple.

36. Inmates are permitted to call witnesses to testify as part of their defense to disciplinary charges brought against them provided those witnesses do not pose a threat to Jail security, have relevant testimony and are available and willing to testify since the Jail has no power to subpoena them.

37. Murphy asked to have two witnesses testify on his behalf: Dr. Hancock and Utah Attorney General Sean Reyes.

38. According to Murphy, these witnesses would provide testimony in support of his claim that he acted in self-defense by engaging in a fight with inmate Whipple.

39. I denied Murphy's request to call Dr. Hancock and Attorney General Reyes for the following, among other, reasons: (a) neither of these witnesses had any relevant testimony to offer since they had no knowledge of the circumstances of the fight between Murphy and inmate Whipple; (b) I had no way to compel their attendance at the hearing; (c) Murphy's claim that he acted in self-defense was not relevant to the charge of having engaged in a fight with inmate Whipple since it was a mutual combat situation; and (d) the videotape clearly showed that Murphy had been the aggressor insofar as he had attacked inmate Whipple.

40. The *Record of the Disciplinary Hearing,* which also contains the evidence that Murphy presented to me, is Exhibit M of the *Appendix* that has been submitted in support of the court-ordered *Martinez Report*.

41. I found Murphy "Guilty" of the offense or fighting with another inmate, and sanctioned him with a $200.00 fine and 20-days of isolation in H-Block, which were among the sanctions that I was permitted to impose upon him pursuant to Jail policy.

42. My written *Findings* are contained in Exhibit N of the *Appendix* submitted in support of the court-ordered *Martinez Report*.

43. In a separate hearing, I also found inmate Whipple guilty of the fighting charges that Deputy Arias had filed against him, imposed the same sanctions upon him as I had imposed upon Murphy, and my *Findings* in the Whipple matter are Exhibit O in the *Appendix* submitted in support of the court-ordered *Martinez Report*.

44. As an Inmate Disciplinary Hearing Officer, I am expected to and do function independently from my superiors at the Jail, including the Sheriff and Jail Commander, who do not become involved in my hearing of disciplinary charges brought against inmates or direct me as to how I am to decide those cases.

45. I do not recall that Murphy challenged or otherwise questioned my impartiality prior to or during the hearing that I conducted in his case and, had he done so, it would have been noted in my *Record of the Disciplinary Hearing* and/or *Findings* and it is not.

46. Including myself, in July of 2019, there were two Inmate Disciplinary Hearing Officers at the Jail so that when a conflict existed I could and did refer the matter to the other Hearing Officer.

47. Moreover, even if Murphy had questioned my impartiality I would not have recused myself from hearing and deciding his case since I had no involvement in the fight incident, the investigation of that incident or the bringing of charges against him as a result of that fight.

48. Furthermore, the fact that I had previously written-up Murphy on the minor disciplinary matter played no role, either directly or indirectly, in my having found him guilty of fighting. Besides, over the course of my career I have written-up many inmates for similar minor disciplinary matters and there was nothing unusual or significant about my having done so in Murphy's case.

I further declare under penalty of perjury that the that the foregoing statements are true and correct to the best of my knowledge.

Executed in Duchesne, Utah on this 7th day of February 2022.

/s/ Daniel Roberts
Daniel Roberts

## CERTIFICATION

I, Jesse C. Trentadue, hereby certify that I have the signed original of this document which is available for inspection during normal business hours by the Court or a party to this action.

Dated this 7th day of February 7, 2022.

                                                      /s/ jesse c. trentadue

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of February 2022, I electronically filed the foregoing **DECLARATION** with the Clerk of the Court using the ECF filing system, and mailed a copy to:

Anthony Charles Murphy
Utah State Prison
Inmate No. 224574
P.O. Box 250
Draper, Utah 84020
*Pro Se Plaintiff*

                                                       /s/ jesse c. trentadue