# Anthony Charles Murphy v. D. Roberts et al.
## Case No. 2:19-cv-00852

## Appendix of Exhibits to Martinez Report

Exhibit A          Summary of Convictions

Exhibit B          Travel Order

Exhibit C          Minor Inmate Disciplinary Actions Policy

Exhibit D          July 20, 2019 Roberts Incident Report

Exhibit E          Arias Incident Report

Exhibit F          Bastian Incident Report

Exhibit G          Robinson Incident Report

Exhibit H          Arias Supplemental Incident Report

Exhibit I          Arias Investigative Report

Exhibit J          Jail Policy B02

Exhibit K          Statement of Charges

Exhibit L          Statement of Sanctions

Exhibit M          Record of the Disciplinary Hearing

Exhibit N          Murphy Findings

Exhibit O          Whipple Findings

Exhibit P          Investigation Photographs

Exhibit Q          Appeal Policy

Exhibit R          Murphy's Appeal

Exhibit S          Decision on Murphy's Appeal

Exhibit T          Officer Roberts' Training Records

Exhibit U        Inmate Grievance Policy

Exhibit V        Criminal Violations Screening

Exhibit W       Information

Exhibit X        Minutes, Sentence, Judgment, Commitment

# EXHIBIT A

 **UTAH DEPARTMENT OF CORRECTIONS - FACE SHEET**     11/05/2021

| Name | Name Type | Name Use |
|------|-----------|----------|
| ANTHONY CHARLES MURPHY | COURT | DEFAULT |
| ANTHONY MURPHY | ALIAS | |
| TONY MURPHY | ALIAS | |

**UDC#: 224574**     **SID#: 1193129**     Legal Status: INMATE

## CRIMINAL HISTORY SUMMARY STATISTICS (Estimates)

| | | |
|--|--|--|
| Adult Arrests: | Age First Arrest: | Sentences > 1 Yr: |
| Adult Convictions: | Juvy Referrals: | |

## PERSONAL CHARACTERISTICS

| Sex: | M | Eyes: | BLUE | Hair: | GRAY/PARTIALLY GRAY |
|------|---|-------|------|-------|---------------------|
| Race: | CAUCASIAN | Ctzn: | US | DOB | |
| Relgn: | UNKNOWN | Mrtl: | DIVORCED | Brth Cty | cynthiana |
| Ht: | 5' 11" | Wt: | 187 lbs | Brth St | KY |
| Educ: | 0 Yrs | Imgr: | | | |

| | Yes | No | Unk | Body Mark | Extended Description |
|--|-----|-----|-----|-----------|----------------------|
| Juvenile Institution: | ○ | ● | ○ | SC ABDOM | APPENDECTOMY SCAR |
| | | | | SC CHEST | SURGERY SCAR FROM CHEST DOWN TO AB 4 INCHES |
| Mental Institution: | ○ | ● | ○ | SC FOOT | SURGERY SCAR |
| Prior Escape: | ○ | ● | ○ | TAT LF ARM | INITIALS VERY FADED |
| Prior Abscond: | ○ | ● | ○ | | |

## FAMILY MEMBERS

| Name | Relationship | Address | Telephone |
|------|--------------|---------|-----------|
| LINDA STANFIELD | SISTER | | |
| MARTY SPICER | FRIEND | | |

## EMPLOYMENT

| Employer: | NA | Job Title: | NA |
|-----------|----|-----------|----|

## ADDRESS

| Address | Type | Telephone |
|---------|------|-----------|
| 14425 S BITTERBRUSH LN DRAPER, UT, 84020-9501 | | |

## IDENTIFYING NUMBERS

| Type | Source | Number |
|------|--------|--------|
| FBI-FED BUREAU INVESTIGTN | BUREAU OF CRIMINAL IDENITIFCTN | 370350EA0 |



| Name | Name Type | Name Use |
|------|-----------|----------|
| ANTHONY CHARLES MURPHY | COURT | DEFAULT |
| ANTHONY MURPHY | ALIAS | |
| TONY MURPHY | ALIAS | |

| | | |
|------|------|------|
| SHERIFF OFFICE | UTAH STATE AGENCY | 326349 |
| SID-STATE ID NUM (OTHER) | FLORIDA | FL02179174 |
| SID-STATE ID NUM (OTHER) | ILLINOIS | IL10635331 |
| SID-STATE ID NUM (OTHER) | KENTUCKY | KY M01572758 |
| UTAH SEX OFNDR REGISTRY | UTAH STATE AGENCY | 2350212 |

**MILITARY HISTORY**

| Military Branch | Status | Military Rank | Discharge Description |
|-----------------|--------|---------------|----------------------|
| USN | VETERAN | | GENERAL |

**DRUG / ALCOHOL USE**


| Name | Name Type | Name Use |
|------|-----------|----------|
| ANTHONY CHARLES MURPHY | COURT | DEFAULT |
| ANTHONY MURPHY | ALIAS | |
| TONY MURPHY | ALIAS | |

## COURT CASE INFORMATION

| | | | |
|---|---|---|---|
| **Case#:** | **091100683** | Convicted Date: | 05/04/2016 |
| Court: | 1ST DISTRICT - LOGAN | Sentenced Date: | 06/27/2016 |
| Judge: | WILLMORE THOMAS | Jail Days | 0 |
| Defense Atty: | DEMLER SHANNON R. | Sex Offender Registration Dt: | |
| Pros Atty: | WALSH SPENCER D. | Date Committed to Prison: | 07/21/2016 |
| Current Location: | OQUIRRH 5 ANNEX | County Name: | CACHE |
| CoDfnd Name: | | Sched Term Date: | |
| CoDfnd #: | | Sched Expire Date: | 07/26/2215 |

## OFFENSES

| | |
|---|---|
| **Arrest Date:** | |
| 76-5-405 AGGRAVATED SEXUAL ASSAULT    (SO)(FT) | |
| **Arrest Agency:** | |
| **Weapon:** | |
| **Court Judgement:** | GUILTY |
| **Sentence:** | PRISON |

| Att? | Degree | Counts | Plea | OTN# |
|------|--------|--------|------|------|
| N | FIRST DEGREE FELONY | 1 | NOT GUILTY | 32444010 |

## SENTENCE

| Minimum Yrs/Mnths: | Maximum Yrs/Mnths: | Mandatory Yrs: | Consecutive: |
|---|---|---|---|
| 15 Yrs 0 Mnths | 100 Yrs 0 Mnths | 0 | NO |

| | |
|---|---|
| **Arrest Date:** | |
| 76-5-302 AGGRAVATED KIDNAPPING    (SO)(FT) | |
| **Arrest Agency:** | |
| **Weapon:** | |
| **Court Judgement:** | GUILTY |
| **Sentence:** | PRISON |

| Att? | Degree | Counts | Plea | OTN# |
|------|--------|--------|------|------|


| **Name** | **Name Type** | **Name Use** |
|---|---|---|
| ANTHONY CHARLES MURPHY | COURT | DEFAULT |
| ANTHONY MURPHY | ALIAS | |
| TONY MURPHY | ALIAS | |

| N | FIRST DEGREE FELONY | 1 | NOT GUILTY | 32444010 |
|---|---|---|---|---|

**SENTENCE**

| **Minimum Yrs/Mnths:** | 15 Yrs 0 Mnths | **Maximum Yrs/Mnths:** | 100 Yrs 0 Mnths | **Mandatory Yrs:** | 0 | **Consecutive:** | YES |
|---|---|---|---|---|---|---|---|

**VICTIMS**

| **Sex** | **Age at Offense** | **Sex Crime** | **Injury Type** | **# of Victims** |
|---|---|---|---|---|
| | | Y | N | 2 |
| F | | N | S | 2 |

| **Arrest Date:** | |
|---|---|
| 76-5-404 FORCIBLE SEX ABUSE (SO)(FT) | |
| **Arrest Agency:** | |
| **Weapon:** | |
| **Court Judgement:** | GUILTY |
| **Sentence:** | PRISON |

| **Att?** | **Degree** | **Counts** | **Plea** | **OTN#** |
|---|---|---|---|---|
| N | SECOND DEGREE FELONY | 1 | NOT GUILTY | 32444010 |

**SENTENCE**

| **Minimum Yrs/Mnths:** | 1 Yrs 0 Mnths | **Maximum Yrs/Mnths:** | 15 Yrs 0 Mnths | **Mandatory Yrs:** | 0 | **Consecutive:** | NO |
|---|---|---|---|---|---|---|---|

| **Arrest Date:** | |
|---|---|
| 76-5-103 AGGRAVATED ASSAULT (FT) | |
| **Arrest Agency:** | |
| **Weapon:** | |
| **Court Judgement:** | GUILTY |
| **Sentence:** | PRISON |

| **Att?** | **Degree** | **Counts** | **Plea** | **OTN#** |
|---|---|---|---|---|
| N | THIRD DEGREE FELONY | 1 | NOT GUILTY | 32444010 |

**SENTENCE**

| **Minimum Yrs/Mnths:** | 0 Yrs 0 Mnths | **Maximum Yrs/Mnths:** | 5 Yrs 0 Mnths | **Mandatory Yrs:** | 0 | **Consecutive:** | NO |
|---|---|---|---|---|---|---|---|


| Name | Name Type | Name Use |
|------|-----------|----------|
| ANTHONY CHARLES MURPHY | COURT | DEFAULT |
| ANTHONY MURPHY | ALIAS | |
| TONY MURPHY | ALIAS | |



**UTAH DEPARTMENT OF CORRECTIONS - FACE SHEET**

11/05/2021

| Name | Name Type | Name Use |
|------|-----------|----------|
| ANTHONY CHARLES MURPHY | COURT | DEFAULT |
| ANTHONY MURPHY | ALIAS | |
| TONY MURPHY | ALIAS | |



Photo Date 01/15/2020

# EXHIBIT B



# Utah Department of Corrections
## Travel Order

Run #: 34
ICR Number:
Court Case:

**Authority** IPP

**Offender Name:** MURPHY, ANTHONY CHARLES  **Offender #:** 224574  **Height:** 5 ft 11 In

**DOB:**  **Classification:** 3L  **Release Date:**  **Weight:** 187 lb

**Travel From.** LP A506  **Travel Date/Time** 03/15/2019 @
**Travel To:** DUCHESNE TO BE HOUSED  **To See:**

**Convicted Offenses:** AGGRAVATED SEXUAL ASSAULT
AGGRAVATED KIDNAPPING
FORCIBLE SEX ABUSE

**Comments:**

**Transportation Cautions.**

**STG.**

**ADA Accomodations:**

**To Be Transported By.** BRENDON MCLAUGHLIN, ERIC MENLOVE

**Entered By:** CODY COOK  **Entry Date/Time:** 03/13/2019 @ 16:57  **Authorized By:** EDWARD ROBINSON

Restraint Instructions (if other than FULL): _____

Start Time: _____

[ ]Office calls  [ ]Officer Calls From Home  [ ]Officer Calls

Seatbelt Times: 0723

Accept/Location Change: Sgt Gehman @0733

Date and Time Out: 3/15/19 0600  Time Arrived: _____  Total Run Miles: 344

Date and Time In: 3/15/19 _____  Total Time: _____  Vehicle #: 33

VCauda _____ ID# _____  Mclaughlin / Menlove
Body Received By  Transportation Officers

Travel Notes: _____

# EXHIBIT C

# D 07.00.00   **DISCIPLINE PENALTIES**

## D 07.01.00   **WRITTEN POLICIES AND PROCEDURES**

### D 07.01.01   Policy and Procedure for Major Violations

The Duchesne County Jail has written policies and procedures which provide:

A.   The limits on penalties which can be imposed for minor disciplinary violations; and

B.   The types of sanctions/punishments which are authorized for major disciplinary violations.

Rationale

Written policies and procedures are necessary to ensure that staff members know what punishments or other sanctions can be ordered for prisoners who violate jail regulations, and to ensure that punishments do not exceed constitutional allowances.

## D 07.02.00   **MINOR DISCIPLINARY ACTIONS**

### D 07.02.01   Informal Discipline

The jail has a system of informally resolving minor disciplinary actions. The two key elements of informal discipline are:

A.   No formal Due Process; and

B.   Minimal penalties.

Rationale

Informal discipline is a useful tool in controlling prisoner behavior. The minimal penalties imposed as a part of informal discipline:

A.   Allow the discipline to be legally imposed without a Due Process hearing; and

B.   Provide staff a simple, straightforward, and less adversarial means of correcting prisoner misconduct.

### D 07.02.02   Minor Penalties

Policy

It is the policy of DCJ that:

When informal discipline is used, the sanction may include one or a combination of the following:

A.    Counseling;

B.    Written or oral warnings;

C.    Denying access to television;

D.    Temporary Restriction of:

      1.    Commissary privileges, (up to seven days);

      2.    Telephones for personal calls, (up to seven days); and

      3.    Personal visits, (up to seven days).

E.    Punitive Isolation less than 7 days; and

F.    Any other sanction which is no more severe than those listed above.

<u>Rationale</u>

Punishments which do not result in a "serious" or "grievous" loss of benefit can be administered without Due Process. The punishments listed in this policy are examples of punishments and other actions which are minor penalties. The benefit of such minor punishments over stronger sanctions for minor violations is that they can be implemented in a more swift and sure manner, and may result in greater cooperation from the involved prisoner. Longer periods of segregation may legally be imposed without Due Process however, for better administrative control of the disciplinary process; a tighter requirement may be justified.

D 07.02.03    <u>Documenting Informal Discipline</u>

Policy
It is the policy of DCJ that:

Informal disciplinary actions shall be documented.

<u>Rationale</u>

Written documentation of informal actions ensures that there is a record of the

action taken. That record is needed:

A.  To better deal with prisoners who accumulate numerous minor disciplinary actions reported by different officers. (Multiple minor disciplinary actions may result in future minor actions being classified as major);

B.  In the event of litigation resulting from discipline actions; and

C.  As a means of documenting the conduct of individual prisoners.

# EXHIBIT  D

## Narrative

Duchesne County Jail
Corporal Daniel Roberts
07/20/2019, 0830HRS
Subjects
Inmate Name: Murphy, Anthony
Jacket# 2019000212
Booking# 2019000212
Incident# 160316231
Incident Report:

On 07/17/2019, at approximately 0900 hrs I, Corporal Roberts was conducting a Security check. I found that inmates had been storing food items that they get from meal pass.

I went into each housing unit to instruct inmates on policy of saving food from meal pass. When I came to housing Unit F-Block only three inmates was out in the day room common area of the block. I radioed for control to make the announcement over the intercom for all inmates to come out of their cells to the day room common area. There was no movement, I yelled a direct order for all inmates to get to the tables for count, they all complied. I noticed that Clark was the last one out of his cell and appeared to be agitated that he had been woke up. I gave a verbal warning of policy on not saving food from meal pass. When going to leave the section through F to E inter connect door. I heard inmate Clark state, that's all this was about this is a fucking joke and bullshit. I turned to address Clark's response, when giving him a verbal warning and instructing the block inmate Murphy became aggravated and argumentative stating, you hold on you can't come in here and fucking disrespect me like that. When attempting to address Murphy's response, inmate Clark began raising his voice and became argumentative. At this time I gave the direct order for all inmates to Rac in, and radioed for control to secure the cell doors.

Investigation Report:

I went to the control room to review the camera and to see who the inmates where that was arguing with me. On camera you can see that Murphy and Clark was the only inmates that confronted me.

Actions Taken:

Inmate Murphy is charged with,

B14 DISORDERLY CONDUCT, RECKLESS ENDANGERMENT,

Elements: An offender may be charged with this offense if the offender: By engaging in tumultuous or threatening behavior or by making unreasonably loud noises

Tumultuous: A state of commotion, noise, and confusion, irregular or confused motion; agitation; high excitement; the act of making a noisy disturbance.

Inmate Murphy has no other disciplinary write ups on record. I am treating this as a minor disciplinary, I moved Inmate Murphy to housing unit H Block Cell 6 and informed him that he will be on a 3 day lock down loss of all starting on 07/17/2019, 0900HRS ending on 07/20/2019, 0900HRS, Inmate Murphy also has a DVD agreement that will be revoked.

End Report:

Corporal Daniel Roberts

# EXHIBIT E

# Incident

**Date:** 7/27/2019  12:00:00AM

**Code:** DISCIPLINARY ACTION

**Description:** WHIPPLE-MURPHY FIGHT

**Subjects:** [I] MURPHY, ANTHONY ~

**Witnesses:** [O] ARIAS, MEGAN ~[O] BASTIAN, RYAN M~[O] BIRD, JOSH ~[O] CLYDE, JANA ~[O] CURRY, JASON ~[O] HOPKINS, MEGAN ~[O] ROBINSON, HUNTER ~

## Narrative

**Entered by:** ARIAS, MEGAN

Duchesne County Sheriff's Office
Agency Case Number: 2019-000738
Spillman Case Number: M19-
Date/Time 07/25/2019 13:08
Offense/assault by prisoner.

On July 25, 2019 at approximately 13:08 Duchesne County Corrections Deputies were informed by the jail controller that an inmate in F block called into control that something was going on and officers, needed to get there. As I Deputy. Arias along with Corporal Bastian, entered F block I seen two male inmates physically assaulting each other in the day room of the block. I ordered all inmates in the block to rack into their cells. I then ordered inmate Melvin Whipple who was on top of inmate Anthony Murphy under one of the tables in the day room to get off of him and move away from Murphy. Whipple complied, and moved away from Murphy.
Whipple was bleeding from the face and had blood on his clothing. Whipple was escorted down to medical room for evaluation of injuries. Whipple had a small laceration on his nose, bruising on his left eye and small abrasion above his right elbow. I asked Whipple, what the fight was about and he expressed that he was sitting at the dayroom table in F block and Murphy was sitting at another table, when Murphy got up and walked over to him and hit him. Whipple then explained that he got up and physically started to engage in the fight with Murphy. Photographs of Whipple's injuries were obtained. Whipple was then allowed to go shower, Whipple's clothing was received and photographed.
Inmate Murphy was escorted up to a medical holding cell and evaluated for injuries. Inmate Murphy sustained bruising to his left eye injuries to both hands where he claims inmate Whipple bit him. Murphy sustained injuries to both elbows, and had scrapes and cuts to both arms. Murphy informed officers that Whipple grabbed him by his beard and ripped a large amount of hair out. Murphy had redness on his chest and back. Photographs of Murphy's injuries were obtained. Murphy, then was allowed to shower and his clothing was collected and photographed. Inmates were moved to separate sections for safety concerns. On

07/26/2019, at approximately 10:06 I met with Whipple in the staff office of the Duchesne County Jail along with Detective. Dela Rowley. D. Rowley explained to Whipple that we wanted to talk to him about the fight that took place on 07/25/2019, D. Rowley then gave Whipple a Miranda Warning, after which time Whipple expressed he preferred not to talk with us without an attorney and then went on to say that we could review cameras and see that Murphy hit him first and that Murphy is the one who should be charged. Whipple then told us that Murphy had said something to him and he said something back and that is when Murphy hit him.

Next, I and D. Rowley met with Murphy in the staff office at approximately 10:10. D.Rowley, then gave him his Miranda Warning, Murphy agreed to continue talking with us about the incident. Murphy explained that problems started about a week prior to the incident with Whipple, after, a shakedown of F block. During the shakedown in F block, Murphy argued with a Corporal. Murphy was then told to roll his stuff up and was moved to another block for a 3 day lock down. After, Murphy's 3 day lock down was up on 07/21/2019 he was moved back to F block and was informed by other inmates that there was a lot of tension in the block for the dvds and dvd players that were taken away for violation of the dvd policy.

Whipple had in his possession an extra dvd player that violates the dvd policy and was fired from his job for multiple other violations. Murphy explained that before the shakedown that he and Whipple were cell mates, and that Whipple blames Murphy for him getting fired and getting his dvd player taken away. Murphy informed us that he was cautious and heard all Whipple's brags about knocking him out and killing him. Murphy, then explained that he requested to talk to IPP Terri Lauchner, about his write up he received during his 3 day lock down. Murphy

explained that he went to Terri's office and spoke to her about his write up and upon returning to his section Whipple was sitting at the table in the day room.

Murphy then explained that he went walking to his cell when Whipple said something to him. Murphy then stopped walked up to the table and Whipple said "You piece of shit." Then Murphy said Whipple made a comment about killing him. Murphy then informed us that after, Whipple said that it was a blur where there was a couple of seconds of Murphy not knowing what happened. Murphy then admits that he swung but was unsure if Whipple acted first. Murphy explained he felt some pain and wrapped Whipple up and were up against the

# EXHIBIT F

# Incident

**Date:** 7/27/2019 12:00:00AM

**Code:** DISCIPLINARY ACTION

**Description:** WHIPPLE-MURPHY FIGHT

**Subjects:** [I] MURPHY, ANTHONY ~

**Witnesses:** [O] ARIAS, MEGAN ~[O] BASTIAN, RYAN M~[O] BIRD, JOSH ~[O] CLYDE, JANA ~[O] CURRY, JASON ~[O] HOPKINS, MEGAN ~[O] ROBINSON, HUNTER ~

## Narrative

**Entered by:** **BASTIAN, RYAN M**

# Duchesne County Sheriff's Office

Cpl. Ryan Bastian
DU# 164
7-27-2019 15:30

Murphy, Anthony
Jacket# 46895
BluHorse Incident# 160316250

Narrative:

At about 13:09 on 7-25-2019 Controller Robinson told Deputy Arias and I (Cpl. Bastian) that we needed to get into F block because something was happening. As I entered F block I could see two inmates partially under a table holding onto each other. There was blood on the tables by the two inmates and on their clothing and this made me think that they were fighting. Deputy Arias and I started giving verbal commands for the other inmates in the block to rack in and for the two inmates to stop fighting and separate from each other. I also called over the radio to get assistance from other officers and to have our medical staff to standby and be ready to assess the inmates. After Inmate Whipple stood up I ordered him to go to the front of the block where Sgt. Curry then escorted him to a room to be checked by a nurse. Inmate Murphy then got up and had to sit at the table for a minute to catch his breath before I escorted him to medical cell 7 where Nurse Megan Hopkins assessed him and gave him oxygen.

After assessing Inmate Murphy and taking pictures of his arms, face, and clothing I escorted him to the change out room in the booking area and had him give me his clothing before he took a shower. The clothing was then put into paper bags and given to investigators.

Medical:

See medical reports on CorEMR

Witnesses Involved:

Controller Robinson     Deputy Arias
Sgt. Curry          Cpl. Bastian
Lt. Givens         Staff Sgt. Bird
Deputy C. Bird        Nurse Megan Hopkins
Nurse Jana Clyde

EXHIBIT  G

**Date:** 7/27/2019 12:00:00AM

**Code:** DISCIPLINARY ACTION

**Description:** WHIPPLE-MURPHY FIGHT

**Subjects:** [I] MURPHY, ANTHONY ~

**Witnesses:** [O] ARIAS, MEGAN ~[O] BASTIAN, RYAN M~[O] BIRD, JOSH ~[O] CLYDE, JANA ~[O] CURRY, JASON ~[O] HOPKINS, MEGAN ~[O] ROBINSON, HUNTER ~

## Narrative

**Entered by: ROBINSON, HUNTER**

## Duchesne County Sheriff's Office

H. Robinson

7-27-2019

(Murphy,Anthony)
Jacket#45777
BluHorse Incident#160316250

Supplementary report

On this date 7-25-2019 around 1:09PM I, Hunter Robinson had gotten a call in from cell F-9 saying they needed officers in the block as fast as possible. I then immediately told Deputy Arias and Cpl. Bastion that we needed officers in F-block. I proceeded to let them into the section. I told the inmates in blocks F and G to get into their cells and I proceeded to lock their cells.

**EXHIBIT H**

Duchesne County Sheriff's Office

Agency Case Number: 2019-000738

Spillman Case Number: M19-

Date/Time 07/25/2019 13:08

Offense/assault by prisoner.

On July 25, 2019 at approximately 13:08 Duchesne County Corrections Deputies were informed by the jail controller that an inmate in F block called into control that something was going on and officers, needed to get there. As I Deputy. Arias along with Corporal Bastian, entered F block I seen two male inmates physically assaulting each other in the day room of the block. I ordered all inmates in the block to rack into their cells. I then ordered inmate Melvin Whipple who was on top of inmate Anthony Murphy under one of the tables in the day room to get off of him and move away from Murphy. Whipple complied, and moved away from Murphy.

Whipple was bleeding from the face and had blood on his clothing. Whipple was escorted down to medical room for evaluation of injuries. Whipple had a small laceration on his nose, bruising on his left eye and small abrasion above his right elbow. I asked Whipple, what the fight was about and he expressed that he was sitting at the dayroom table in F block and Murphy was sitting at another table, when Murphy got up and walked over to him and hit him. Whipple then explained that he got up and physically started to engage in the fight with Murphy. Photographs of Whipple's injuries were obtained. Whipple was then allowed to go shower, Whipple's clothing was received and photographed.

Inmate Murphy was escorted up to a medical holding cell and evaluated for injuries. Inmate Murphy sustained bruising to his left eye injuries to both hands where he claims inmate Whipple bit him. Murphy sustained injuries to both elbows, and had scrapes and cuts to both arms. Murphy informed officers that Whipple grabbed him by his beard and ripped a large amount of hair out. Murphy had redness on his chest and back. Photographs of Murphy's injuries were obtained. Murphy, then was allowed to shower and his clothing was collected and photographed. Inmates were moved to separate sections for safety concerns. On

07/26/2019, at approximately 10:06 I met with Whipple in the staff office of the Duchesne County Jail along with Detective. Dela Rowley. D. Rowley explained to Whipple that we wanted to talk to him about the fight that took place on 07/25/2019, D. Rowley then gave Whipple a Miranda Warning, after which time Whipple expressed he preferred not to talk with us without an attorney and then went on to say that we could review cameras and see that Murphy hit him first and that Murphy is the one who should be charged. Whipple then told us that Murphy had said something to him and he said something back and that is when Murphy hit him.

Next, I and D. Rowley met with Murphy in the staff office at approximately 10:10. D.Rowley, then gave him his Miranda Warning, Murphy agreed to continue talking with us about the incident. Murphy explained that problems started about a week prior to the incident with Whipple, after, a shakedown of F block. During the shakedown in F block, Murphy argued with a Corporal. Murphy was then told to roll his stuff up and was moved to another block for a 3 day lock down. After, Murphy's 3 day lock down was up on 07/21/2019 he was moved back to F block and was informed by other inmates that there was a lot of tension in the block for the dvds and dvd players that were taken away for violation of the dvd policy.

Whipple had in his possession an extra dvd player that violates the dvd policy and was fired from his job for multiple other violations. Murphy explained that before the shakedown that he and Whipple were cell mates, and that Whipple blames Murphy for him getting fired and getting his dvd player taken away. Murphy informed us that he was cautious and heard all Whipple's brags about knocking him out and killing him. Murphy, then explained that he requested to talk to IPP Terri Lauchner, about his write up he received during his 3 day lock down. Murphy explained that he went to Terri's office and spoke to her about his write up and upon returning to his section Whipple was sitting at the table in the day room.

Murphy then explained that he went walking to his cell when Whipple said something to him. Murphy then stopped walked up to the table and Whipple said "You piece of shit." Then Murphy said Whipple made a comment about killing him. Murphy then informed us that after, Whipple said that it was a blur where there was a couple of seconds of Murphy not knowing what happened. Murphy then admits that he swung but was unsure if Whipple acted first. Murphy explained he felt some pain and wrapped Whipple up and were up against the wall, next Murphy explains that Whipple grabbed his privates. Murphy then said he stretched himself out from Whipple and pushed Whipple up against the wall. Murphy then claims he turned to walk away and looked back and could see Whipple coming after him. Murphy then told Cody (Whipple) to quit. Murphy said that they went backwards and he doesn't think Whipple hit him but did not know. Murphy then explained that as he was going backwards he tripped over the stool at the table in the dayroom and fell to the ground, and was down under the table

Whipple then was on top of Murphy. Murphy explains that Whipple then raked his fingers across Murphy's eyes. Murphy claims he then grabbed onto Whipples arm and wrist to keep him from attacking him further. Murphy explains that Whipple then started chewing on his hands. After, this is when officers

entered and order both men to seperate. Murphy then explains that the whole fight was not over just the dvd problem that there is a totally different issue between him and Whipple in his opinion. Murphy explains that Whipple has a detainer out of Texas that Whipple is worried about and that Whipple has 8 months until he sees the board, and will do anything to stay here.

I then interviewed an inmate who witnessed the fight who has asked to remain anonymous for safety concerns. Witness explains, that he was in the shower and was just getting out and went to his cell to get dressed when he heard someone say Fuck off, he then heard a couple of thumps on the table, witness then says he looked up and saw Murphy had Whipple tied up and that Murphy slammed Whipple's head into the cell door in F-10 he then said that Murphy let go of Whipple.

Next, he said Murphy got under the table and that is when Whipple got on top of Murphy and started biting him. Witness believed that Whipple was going to kill Murphy. Witness says Whipple has been threatening to harm Murphy ever since the shakedown in F block. Witness, informed me that he is the one that called into control to report that something was going on in F- block. Witness, also mentioned that Whipple, has made comments about being afraid of being sent back to Texas for his detainer and would do anything to be able to stay here. Witness, reports that Murphy told him that he took the first punch.

See attached evidence: photographs, audio recording interview with Whipple, Murphy, and witness. Video Footage of fight.

Deputy. Megan Arias

# EXHIBIT

# Duchesne County Sheriff's Office

Deputy Megan Arias
DU# 171
(07/29/2019 12:18)

(Anthony Murphy)
Jacket#46895
BluHorse Incident#160316250

Charges: B02 . *B02 FIGHTING, HORSEPLAY*

*Elements: An offender may be charged with this offense if they:*

* *Engaged in threatening conduct;*

* *Made threats verbally, physically, or in writing that placed any person in fear of bodily injury;*

* *Was involved in any fight.*

## Incident Report:

Deputies were informed by the jail controller that something was going on in F block. I responded with Corporal Bastian, as we entered F block I saw two male inmates fighting. I identified Cody Whipple and Anthony Murphy fighting. I ordered both males to stop. I saw Cody Whipple and Anthony Murphy under the table in the dayroom. At this point both inmates complied and separated. Cody Whipple stated in an interview that he was sitting at the dayroom table and that Anthony Murphy came over to the table and punched him in the side of the face. Anthony Murphy stated during an interview that he was bitten several times by Cody Whipple, during the altercation.

## Narrative:

Deputies were informed by the jail controller that something was going on in F block. I responded with Corporal Bastian, as we entered F block I saw two male inmates fighting. I identified Melvin Whipple and Anthony Murphy fighting. I ordered both males to stop. I saw Melvin and Anthony under the table in the dayroom. At this point both inmates complied and separated. Melvin was escorted down to medical by Sergeant Curry for evaluation of injuries. Anthony Murphy sat at the dayroom table for a few minutes to catch his breath, then escorted to a medical cell for evaluation of injuries.

I saw blood on Melvin's face and clothing. He had a small laceration and swelling on his nose he also had bruising to his left eye from altercation. I asked Melvin what the fight was about and he replied that he

was sitting at the dayroom table in F block and Anthony was sitting at another table. Melvin then stated that Anthony got up from the table and walked over to the table Melvin was sitting at and punched him in the side of the face. Melvin stated that he got up from the table and physically engaged with Anthony. Photographs of Melvin's injuries were taken for evidence. Melvin then showered and his clothing was collected by deputies and photographed for evidence.

Anthony had bruising to his left eye, injuries to both hands where he stated that Melvin bit him. I saw that Anthony had injuries to both elbows, scrapes and cuts to both arms and redness to his torso. Anthony stated that Melvin grabbed his beard and ripped a large amount of hair out. Photographs of Anthony's injuries were taken for evidence. Anthony then showered and his clothing was collected by deputies and photographed for evidence. Melvin Whipple was moved from F block over to H block for safety and security reasons.

On 07/26/2019 Detective Rowley and I met with Melvin to discuss what the altercation was about. After, reading Melvin his Miranda warning he wished to have an attorney present he then went on to say he was sitting at the table and Anthony came over hit him. Melvin stated that Anthony should be charged.

Next, Detective Rowley and I met with Anthony Murphy after giving him a Miranda warning he agreed to discuss the altercation. Anthony stated that problems with Melvin started approximately a week ago after a shakedown of F block. Anthony stated that he argued with deputies which resulted in him getting 3 day lockdown in H block. On 07/21/2019 he returned to F block Anthony stated that he was informed by others in the block that there was tension in the block from the shakedown. Anthony stated that during the shakedown dvds and dvd players that were in violation of the dvd program were confiscated. Anthony stated that he and Melvin were cell mates during the time of the shakedown and Melvin was in violation of the dvd policy and was fired from his job as night janitor and was blaming Anthony. Anthony stated that he was cautious upon returning to F block and that he had heard Melvin's brags on knocking him out and killing him.

Anthony then stated that he went down to IPP Terri Lauchner's office to speak to her about his write-up he received for arguing with deputies. Upon Anthony returning to F block he went and sat down at the table to talk with another inmate. Next, he got up from the table and was going to his cell when he heard Melvin who was sitting at another table in the dayroom say something. Anthony then stated that he stopped turned around and went over to Melvin and stated Melvin said "You piece of shit" and made a comment about killing him. Anthony stated that after Melvin made his comments he went into like a blur for a short time . Anthony stated that he did punch Melvin but was unsure if he swung first. Anthony stated he felt pain and wrapped Melvin up then they were up against the wall and Melvin grabbed Anthony's groin area. Anthony stated he stretched himself out away from Melvin and pushed Melvin back into the wall. Anthony stated he then turned and was walking away when he could see Melvin advancing towards him. Anthony stated that he told Melvin to quit but he continued towards him and he went backwards tripped over the stool at the table in the dayroom then fell to the ground ending up under the table. While on the ground under the table Anthony stated that Melvin was on top of him and raked his fingers across his eyes. Anthony stated that he grabbed onto Melvin's arm and wrist to prevent him from attacking him further, he then stated that Melvin was biting him on the hands and arms.

Anthony stated that the altercation was more than just the dvd issue. He explained that Melvin sees the board in 8 months and has a detainer out of Texas and Melvin has expressed to him that he was scared of being sent there when his time is served in Utah and that Melvin would do whatever he could to stay in Utah.

I then met with a witness to the altercation he stated that he was getting out of the shower and going to his cell when he heard someone say "Fuck off" then heard thumps from the table. Witness stated he looked up and saw Anthony had Melvin wrapped up then shoved Melvin's head into the cell door of F-10 he then stated that Anthony let go of Melvin. Witness states that Anthony got under the table and saw Melvin get on top of Anthony and started biting him. Witness stated that Melvin was going to kill Anthony so he called into to control to report the altercation. Witness stated that Melvin has made comments to him being afraid of the detainer out of Texas and would do anything to stay in Utah. Witness stated that Anthony told him that he swung first.

    End of report.

Investigation:
    Interview 1: MelvinWhipple stated in an interview that he was sitting at the dayroom table and that Anthony Murphy, came over to the table and punched him in the side of the face.

    *Interview 2: Anthony Murphy stated in an interview that he was bitten several times by Melvin Whipple, during the altercation.*

    *Interview 3: Witness states that Anthony Murphy and Melvin Whipple had a verbal altercation that turned physical. Witness states he notified control during altercation.*

    *Photographs: see attached photos.*

    *Video: Refer to Scratch drive under jail videos with a reference date of 07/25/2019.*

Additional Actions taken:
    Melvin Whipple was moved from F block to H block from 07/25/2019-07/27/2019 for TRO for safety and security of the jail.

Medical:
    Melvin Whipple, was evaluated after altercation by medical staff.

Witnesses Involved:
    Controller Robinson, Deputy Arias, Corporal Bastian, Staff Sergeant Bird, LT Givens, Sergeant Curry, Nurse Hopkins, Nurse Clyde.

Signature: _____        _____

# EXHIBIT   J

Code Elements:

## B01    MISUSE OF ADMINISTRATIVE REVIEW

**_Elements_:**    An offender may be charged with this offense if the offender frivolously, maliciously, or vexatiously used or misused any administrative review process.

**_Definitions_:**

**Administrative Review**    Any administrative process, whether by committee or individual, used to review any right, privilege, program, conditions of confinement, process, condition of work, education, therapy, or application to any of the above.

**Frivolous**    Instigating or participating in an Administrative Review of an issue with no basis in fact or law, when the offender knows, or should have known, this was the case.

**Malicious**    Instigating or participating in an Administrative Review of an issue with the intention or desire to harass, inflict intentional insult, cause pain, injury, or distress, or by using language that is attacking, obscene, vulgar, or personally insulting.

**Vexatious**    Instigating or participating in an Administrative Review of an issue with the intent to annoy, irritate, provoke, upset, or inconvenience any person or disrupt any administrative process.

## B02    FIGHTING, HORSEPLAY

**_Elements_:**    An offender may be charged with this offense if they:

*    Engaged in threatening conduct;

*    Made threats verbally, physically, or in writing that placed any person in fear of bodily injury;

*    Was involved in any fight; or

*    Participated in any form of horseplay.

**_Definitions_:**

| | |
|---|---|
| **Bodily Injury** | Any injury. |
| **Fight** | Physical altercation or contact as a result of anger or mutual combat. |
| **Horseplay** | Rough and boisterous play, sparing, play fighting, play, or actions that cause any person to become alarmed. |
| **Threatening Conduct** | Any conduct that causes any person to be in fear of their safety or become alarmed, or any practicing or offensive/defensive tactics. |

**B03 UNAUTHORIZED POSSESSION OR USE OF AN ELECTRONIC DEVICE**

**_Elements_:** An offender may be charged with this offense if they:

* Are found to be in possession of, or to have used any computer equipment, (hardware or software), phone (land line or cell), scanner, communication device without authorization; or

* If authorized, uses the device/equipment for any unauthorized purpose.

**B04 UNAUTHORIZED POSSESSION OR USE OF PROPERTY**

**_Elements_:** An offender may be charged with this offense if they:

* Damaged, destroyed, lost, or caused to be damaged, destroyed, or lost any government property or the property of another;

* Makes use, or has possession of, any government property without authorization or in an unauthorized manner; or

# EXHIBIT  K

# DUCHESNE COUNTY JAIL

NOTIFICATION OF [ ] MAJOR [ ]MINOR DISCIPLINARY ACTION    CASE NUMBER 11003116250

| LAST NAME | FIRST | MIDDLE | UDF / CRSO/S # | HEARING DATE |
|-----------|-------|--------|----------------|--------------|
| Murray | Mmmm | | | |

NOTIFIED DATE  TIME  LOCATION
7/15/19  approximately 13:08  -F Block dayroom.

CHARGES / COMMENTS

8:08 Fighting in F block dayroom with inmate Whipple.

9:10 Fighting, Horseplay. Inmate was involved in fight.

Inmate Murray and Kevin Whipple fighting in F block.

Charge Supervisor _____ Date 7-25-19  ID # 17
Officer Serving Copy _____ Date 07/27/19  ID # 36  Date 7/29/19
Hearing Officer C.M. Crivello  Screening Supervisor P~J  Date 7/29/19

MD-1

# EXHIBIT L

frequency of controlled substance tests for a
period of up to one year, and an assessment of
restitution for the cost of the testing.

Minimum and Maximum Disciplinary Sanctions

In order to help ensure disciplinary sanctions are
adequate and fairly consistent, the following
guidelines should be followed:

A. "A" Sanctions

For conviction on any case where the most
serious guilty finding is on an "A" charge the:

1. minimum sanction should be a $200 fine or
thirty days punitive isolation in addition
to any other incident-specific sanctions
and restitution; and

2. the maximum sanction that may be imposed is
a $300 fine and thirty days punitive
isolation in addition to any other
incident-specific sanctions and
restitution.

B. "B" Sanctions

For conviction on any case where the most
serious guilty finding is on a "B" charge the:

1. minimum sanction imposed should be a $100
fine or twenty days punitive isolation in
addition to any other incident-specific
sanctions and restitution; and

2. the maximum sanction that may be imposed is
a $200 fine and twenty days punitive
isolation in addition to any other
incident-specific sanctions and
restitution.

C. "C" Sanctions

For conviction on any case where the most
serious guilty finding is on a "C" charge the:

1. minimum sanction imposed should be a $50
fine or ten days punitive isolation in
addition to any other incident-specific
sanctions and restitution; and

2. the maximum sanction that may be imposed is
a $100 fine and 15 days punitive isolation
in addition to any other incident-specific
sanctions and restitution.

DIOGO 04-007                          RDF01/05.03

Revised 5/1/02.

# EXHIBIT M

 

## DUCHESNE COUNTY JAIL

## INMATE DISCIPLINARY HEARING

This is an Inmate Disciplinary Hearing for: Murphy, Anthony

Booking Number: 209000212 ,and Jacket Number: 46895.

The Case Number for this disciplinary action is: 16316250

The date of this write-up is: 07/27/2019 , this write-up was served: 07/29/2019 .

Inmate Murphy ____ are you ready and prepared for this disciplinary hearing? Yes No

Sgt. D. Roberts is the Inmate Disciplinary Hearing Officer conducting this hearing.

This hearing is being conducted at the Duchesne County Jail on: 08/07/19 at: 1130 hrs.

Inmate Murphy is charged with:
B02, Fighting with inmate whipple in F-Block

Inmate Murphy , have you received a copy of the Disciplinary write-up? Yes No

Inmate Murphy ____ , have you read the write-up? Yes No

Inmate Murphy , how do you plea to the charge(s)? Guilty Not Guilty

Inmate Murphy ____ , is there anything you would like to say or present for your defense?

NOTES: Inmate stated that he was befending his life
he submitted Documents that he used in his defence

Findings: Murphy is guilty of of Fighting the documents.
he submitted are not relevent to his charge.

Tonic immobility is a well-established phenomenon in which people experience "profound motor inhibition"—in other words, people tend to "freeze" when faced with what they perceive to be inescapable and significant dangers. There is a specific part of the brain (called the hypothalamus) which ostensibly takes over when a person is confronted with a major threat to his/her safety; when this happens, a person enters "flight or fight mode," so to speak. However, under extreme circumstances, the hypothalamus triggers tonic immobility—. This is generally understood to be a last-ditch effort to attempt to preserve one's life. The situation is very well documented among a variety of animals and recent research has established its manifestation among humans, also. Although it may seem odd, people who are confronted with a serious threat may act in an entirely illogical fashion—in essence, operating in a state similar to "playing dead"—because a very specific part of their brain essentially puts a person on an "autopilot" of sorts and they may do or say nothing even during a very serious threat to their safety. Research has linked this kind of behavior specifically to individuals who are victims of sexual assault. In fact, this kind of unexpected response is included as part of the official criteria for a diagnosis of post-traumatic stress disorder (PTSD).

Another unexpected phenomenon that often occurs with people who are confronted with extreme threats—including victims of sexual assault—is that their brain enters into a state of hypervigilance. In short, after the hypothalamus takes over, the human brain begins to function in "survival mode" and our brain suddenly changes the way it works. The basic idea is that our brain is focused almost exclusively on surviving, so some of its more normal activities are sacrificed in order to focus on survival. There is a very simple principle of trade-offs involved. In order to help you survive, your brain stops doing some things it normally would. While this certainly helps you survive, it comes at a cost. One of those costs is what you focus on during the threat, another is what you remember. Because of this, memories of what happens during a traumatic event are often jumbled in their organization, do not follow timelines well, and/or may not seem to make a lot of sense—especially when they are first recalled. This is because the part of the brain responsible for recording memories doesn't work during traumatic events in the way that it does during normal events. Thus, memories of traumatic events are often very different from memories of non-traumatic events. This, also, is part of the criteria for a diagnosis of PTSD.

An example may help illustrate some of what happens when people face a major threat to their safety. Imagine that you are walking through the forest and suddenly come face-to-face with a grizzly bear; chances are, you may not focus very much on everything around you. In fact, you may not focus very much on anything except getting away as fast as you possibly can. You run as fast and as hard as you can; this may result in tripping, falling, running into things, and/or any other number of events that you would normally never allow—let alone ignore. Or, if, by some circumstances, you find yourself immediately within the bear's reach—close enough that you know you cannot possibly get away—you may become so afraid that you freeze; drop to the ground, and cannot move—as if you are paralyzed with fear. Both of these behaviors are "automatically controlled" by your hypothalamus; in other words, these behaviors are like reflexes—they happen to you without your opinion because a very special part of your brain takes over for you. Now, imagine that you have somehow outrun the bear and you have managed to get to a safe place. What happens next? Most likely, you

collapse. You do not even notice — let alone care for — all of the scratches, scrapes, and bruises you have just acquired during your terrified run to safety. Your brain has just ordered your body to sacrifice everything in order to try to survive. If you ran as hard and as fast as you could to get away from that bear, you will almost certainly not remember how you got to where you are now. Also, you will almost certainly not be able to retrace the exact steps you took to get to safety. You will absolutely not be able to remember the specific things you have seen, smelled, or heard. If you became paralyzed, chances are you will not move for a very long time after the bear has left— even though you may tell yourself that you want to, that you should, or that it is now safe. When your brain takes over to try to help you survive, the normal rules of logic and reason do not work very well. Again, your memory of what just happened and how it happened will not be as good as you expect. This is because while your brain is in survival mode, it is not storing memories the way it normally does—just like you did not even notice all of the times you fell down, ran into something, or got hurt while trying to save yourself.

There is a lot of science that explains these concepts and demonstrates that they happen in humans; the bottom line is that in order to help you survive, your brain stops doing what it normally does because it is focused on trying to keep you alive— even if it means it orders your body to do things that may not see a logical at first glance. This is also why it is so difficult for people who have experienced very traumatic events, like sexual assault, to explain their stories in a way that people expect them to explain them. It is also why many people question whether stories of sexual assault may be true. However, when we understand how the brain works during trauma, suddenly, the stories people tell about their trauma experiences make a lot more sense. It is not necessarily that the story they are telling is not true; it's that the memories they acquired during the trauma were acquired under very unique brain functioning and, therefore, do not follow the same set of expectations that we typically have for the stories people tell. Just like the story we hear from someone covered in dirt, bruises, scratches, and out of breath may not make a lot of sense until we learn that they have just escaped a grizzly bear. They may not make any sense; they may appear to be a bit crazed; they may not be able to explain well what has just happened. However, this does not mean that they have not just survived a very dangerous situation.

Copy pages 3635- 3638

Witnesses
Kyle Max Hancock PhD

246 east 1260 North
Logan UT 84341
435 750-6300.
(Kmh. mlc @ gmail.com)??)

Utah Attorney General
Sean D. Reyes (7969)
160 east 300 South, 5ᵗʰ Floor
P.O. BOX 140854
Salt lake City UT 84114-0854
801 366-0180

Any deputy or Assistant Solicitor
General that has taken the oath to
support and defend the Constitution
under Article W section 10 of the Utah
Constitution may take the place of the
Utah Atty General.

ARticle VII Section 16, The atty general shall
be the legal adviser of the state officers.

# Legal Reference

Merriam-Websters Dictionary of Law
Revised and updated guide to the language
of Law.

Legal definition of "Fighting Words":
n pl : words which by their very utterance
are likely to inflict harm on or provoke a
breach of the peace by the average person
to whom they are directed. ◆ Fighting words
are not protected speech under the First Amendment
to the U.S. Constitution.

Self-defense n 1: the use of force to defend
oneself 2: an affirmitive defense alleging that
the defendant used force necessarily to protect
himself or herself because of a reasonable belief
that the other party intended to inflict great
bodily harm or death.

Clean hands n pl : innocence of wrong doing or deceit < plaintiff must come into court with clean hands.

Clean hands doctrine n : a doctrine that originated in equity and that bars a plaintiff from seeking judicial relief regarding a matter for which he or she is not free of guilt and does not have clean hands.

Justice Thurgood Marshall stated " when the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions; his yearning for self-respect does not cease; nor his quest for self realization considered. If anything, the needs for identity and self respect are more compelling in the dehumanizing prison environment.

# EXHIBIT  N

**(XX)MAJOR ACTION**
**CASE: 160316250**
**DATE: 08/07/2019, 1130HRS**

**DUCHESNE COUNTY VS. Inmate Murphy, Anthony      Jacket# 46895**

**PLEA: Inmate Murphy, Anthony Plead Not Guilty**

**Findings: Guilty**

**(XX) GUILTY CHARGES(S): B02 FIGHTING, HORSEPLAY**

**Elements: An offender may be charged with this offense if they:**
**\* Was involved in any fight**
**Definitions:**
**Fight Physical altercation or contact as a result of anger or mutual combat.**

**THE EVIDENCE RELIED UPON TO BASE THIS FINDING:**
        Based upon the evidence in the Officer's report, and the video footage of the incident and pictures of both subjects involved. I find that there is enough evidence to find inmate Murphy guilty of the charge.
        Under the totality of the circumstances, Murphy did engage in a physical altercation or Mutual combat with inmate Murphy, by being the first to engage in the physical altercation.

**ADMINISTRATIVE ACTION TAKEN:**

            Inmate Murphy's disciplinary sanction is a fine of $200.00 and to serve the 20 day punitive isolation, housing assignment will be H block cell 3 loss of all starting on 08/07/2019, 0900hrs and will end on 08/27/2019, 0900hrs. He will only be allowed use of the Kiosk for medical request and ordering of personal hygiene. He will only be allowed out of his cell on Monday, Wednesday, and Friday for 20 min to shower and clean his cell.

Sgt. D. Roberts
DCSO 10/29/2018
SGT. D. Roberts
INMATE DISCIPLINARY HEARING OFFICER

# EXHIBIT O

## DUCHESNE COUNTY SHERIFF'S OFFICE
## CORRECTIONS DEPARTMENT
## DISCIPLINARY FINDINGS

**(XX)MAJOR ACTION**
**CASE: 160316248**
**DATE: 08/07/2019, 0840HRS**

**DUCHESNE COUNTY VS. Inmate Whipple, Melvin Cody**    **USP# 45720/Jacket# 45777**

**PLEA: Inmate Whipple, Melvin Cody Plead Not Guilty**

**Findings: Guilty**

**(XX) GUILTY CHARGES(S): B02 FIGHTING, HORSEPLAY**

**Elements: An offender may be charged with this offense if they:**
**\* Was involved in any fight**
**Definitions:**
**Fight Physical altercation or contact as a result of anger or mutual combat.**

### THE EVIDENCE RELIED UPON TO BASE THIS FINDING:

Based upon the evidence in the Officer's report, and the video footage of the incident and pictures of both subjects involved. I find that there is enough evidence to find inmate Whipple guilty of the charge.

Under the totality of the circumstances, Whipple did engage in a physical altercation or Mutual combat with inmate Murphy, by not retreating, staying engaged, and being an active participant in the physical altercation.

### ADMINISTRATIVE ACTION TAKEN:

Inmate Whipple's disciplinary sanction is a fine of $200.00 and to serve the 20 day punitive isolation, housing assignment will be H block cell 3 loss of all starting on 08/07/2019, 0900hrs and will end on 08/27/2019, 0900hrs. He will only be allowed use of the Kiosk for medical request and ordering of personal hygiene. He will only be allowed out of his cell on Monday, Wednesday, and Friday for 20 min to shower and clean his cell.

SgT. J. Roberts
DCSO 10/29/2018
SGT. D. Roberts
INMATE DISCIPLINARY HEARING OFFICER

# EXHIBIT  P



Taken on 7/25/19
Case# 2019-000738
Murphy, Anthony, after fight.
Redness on chest. Hand injuries.

Taken on 7/25/14
Case# 2019-000738
Whipple, Cody, after fight.
Nose injury and bruised left eye.



Town in
case # 2020-009788
9/25/19

Murphy, Anthony, rivir front beard
hair was pulled out by whipple body



Taylor, um Wright
humerus, right
Case # 2010-738
7/25/19

Taken on 7/25/18
right arm injury
Humphrey, Humphrey
Case # 2018-000738



Taken on 7/25/19
Case#2019-000738
Multiple puncture
left arm and hand
painful pupt and joint



Taken on 7/25/19
Case# 2019-001-898
#41 shown showing
right palm and wrist injury



Taken on 7/25/19
Case# 2019-000738
Murphy Anthony
Hand injuries



Taken on 7/25/19
Case# 2019-DOOT38
Duchesne County Jail F block dayroom.
F-10 cell door.



Taken on 7/25/19
Case # 2019-0007138

Dahasne County Jail F-block
dayroom. Table, where inmate, Murphy
Anthony, and Whipple, Cody were
actively fighting.



Taken on 7/25/19
CORE# 2019-000738

Duchesne County Jail F-block
dayroom table, where inmate, Murphy
Anthony and Whipple, Cody were
actively fighting.

# EXHIBIT   Q

D 06.04.13    <u>Appeals</u>

Policy

It is the policy of DCJ that:

Prisoners should be provided an opportunity to appeal adverse rulings to an authority above the Hearing Officer.

Appeals shall be forwarded to the Jail Commander/designee. This step will be the last stage in the Appeal Process.

Appeals should be limited to claims that:

A.    Due Process requirements were not adequately followed;

B.    The IDHO failed to meet the "some evidence" standard of proof; and

C.    Disciplinary sanctions were unconstitutionally harsh or unreasonably light.

<u>Rationale</u>

Appeals are not constitutionally mandated however, they benefit both the prisoner and Jail Officials. Prisoners are benefitted by receiving a review of a disciplinary action by someone of higher authority than the hearing entity. Jail Officials benefit because if there is a flaw in the disciplinary action, they will be able to correct the problem before it becomes a Cause of Action in a Lawsuit.

# EXHIBIT  R

TO: Duchesne County Jail

FROM Anthony Murphy
(Inmate Name)

**REASONS FOR APPEAL**

List the reasons why the prior Disciplinary Hearing Officer's decision is unacceptable:

(1) The element of the offense was not proven by the evidence. Its been established by the investigation and MR Roberts finding that Murphy was not guilty at MR Whipple. Also MR Roberts finding that Murphy engaged in a physical altercation "or" mutual combat misinterprets the definition of fight. The reason for the physical altercation had to be the result of anger or mutual combat. Also defending yourself against an imminent threat of harm or death is not an agreement to mutual combat. Murphy was subjected to 6 days of extreme stress. 16 hours a day for a total of approx. 80 hours of not knowing when or what form MR Whipple' retaliation would come from. Finally on Thursday he provided me with a specific threat to kill me. At that point as I explained to MR Roberts my brain took over all actions. I had no control over them until I had neutralized the threat. The article I gave to MR Roberts was enough proof that evidence that is material and relevant existed and for a meaningfull due process hearing he should have considered the evidence and even personally talked

**IF ADDITIONAL PAGES ARE NECESSARY PLEASE ATTACH TO THIS SHEET**

Signature

08-07-2019
Date Submitted

**FOR OFFICE USE ONLY.**
Date Received. 8/12/19
Received by L.T. Potter, jun

## Page Two

to DR. Hancock to determine if someone
that is faced with a tramatic event like
a threat to their life has the ability or
mental capacity to consent to mutual combat
or is the fight or flight mode completely
automatic and no one can control it.

The legal definitions that I supplied to MR.
Roberts concerning Self-defense and fighting
Words should have been considered before
making a decision. Also the Utah Constition
Article 1 Section 1 that I recited should have
been given great thought.

To find mutual combat solely on the grounds
that someone through the first punch is a
complete denial of the due process that you say
I'm guareenteded.

(2) The sanctions are clearly excessive.

Pursuant to the disciplinary principles
found in your policy and procedure handbook.
First offenders should be counseled and
taught not disciplined to the absolute
maximum like was handed down to me.
For over six years I've been locked up
without a negative c-note, as a matter
of fact I recieved Two positive c-notes
in supervison prison. And I'm sure my
year stay at Son Pete Co. will show a
model inmate. So under the circumstances
just because you can impose max penalties
does not mean they are appropriate. And
Clearly maximum sanctions for first offenders
under these circumstances is excessive, and
Cruel and unusual punishment when your
policy dictates otherwise.


(3) Required disciplinary procedures were
not followed.

Most important to the required disciplinary procedures is: We have the right to a fair and impartial Hearing officer. That officer should not have been involved in the case or the investigation. MR. Roberts was involved with inmates in F-block in an verbal exchange which resulted in Murphy and another inmate being T.B.O. for three days. After locking down said inmates MR. Roberts along with other deputies did a shake down of F Block and finding several violations concerning D.V.D. players they confiscated MR. Whipples two D.V.D. players and fired him from his job. Although its not logical for Whipple to blame Murphy for his disregard to the rules, it was MR. Roberts actions along with his direct involvement that should have excluded him from the I.D.H.O position in this case. Since he did not read the evidence report I submitted and he already knew what cell I was to be locked down in in H-block shows his preconceived guilty verdict prior to speaking with me.

Duchesne Co. Jail
Disciplinary Hearing Appeal Form

Page Five

Conclusion.

Even though inmates will not talk about the
fight there were abt willing to talk about
Whipples threats of what he was going to
do to Murphy and the I.D.H.O. should
have spoke to them privately. Also the
evidence and defense that Murphy submitted
should have been taken seriously and examined
by a competent third party. A simple phone
call to the DR. could have educated the hearing
officer as to the true facts of the case. The
policy and procedure book states this appeal
will go to the administrative Law Judge and
I ask that you give me a meaningful due process
hearing where all the relevant evidence can be
evaluated by a fair and competent hearing officer.

Respectfully,

08-07-2019

# EXHIBIT  S



Inmate: Anthony Murphy

State ID Number: 235987

Case Number: 16031650

Date: 8/14/19

I have reviewed your appeals case. The policy of the Duchesne County Jail is that appeals should be limited to claims that;

A.   Due Process requirements were not adequately followed;

B.   The IDHO failed to meet the "some evidence" standard of proof; and

C.   Disciplinary sanctions were unconstitutionally harsh or unreasonably light.

In review of your case it is found that; Due Process requirements were adequately followed. The case was heard by an impartial hearing officer. Sgt. Roberts had no involvement in case 16031650 that involved the fight with inmate Whipple. The request to call witnesses that can offer relevant and competent testimony was received and reviewed by the IDHO. Those requests were denied based on no relativity to the case. Dr. Handcock and Attorney General Sean Reyes's testimony is not relative to this case.

The IDHO has substantially met the criteria of "some evidence". Some evidence being a very low standard of evidence. It is clear that by video, testimony

and reports the standard of "some evidence" has been exceeded. The U.S. Supreme Court established the standard of proof in prisoner discipline cases as "some evidence". The court made it clear that a hearing entity's factual finding or decision with respect to appropriate punishment are not subject to second guessing by courts.

Disciplinary sanctions were not found to be unconstitutionally harsh or unreasonably light. The sanctions given fit well between the minimum and maximum sanctions agreed upon by a committee of Inmate Disciplinary Officers comprised of Officers employed by county Sheriff's and Department of Corrections representatives.

By the Utah Jail Standards the case should not be forwarded to an administrative law Judge unless it meets the criteria of A,B, or C above.

Final review is that the appeal is denied.

Lt. Travis Givens
Jail Commander

# EXHIBIT  T

Sgt. Daniel Roberts Training record

## JCCA GRADUATION APPLICATION

| Course | Section / Title | Instructor(s) | Credit Hours | Date Completed | Location |
|---|---|---|---|---|---|
| | **01 CIVIL LIABILITY & RISK MANAGEMENT** | | 9 | | |
| 01.01a | Proactive Approach to Protect Against Liability: Introduction | DeLand | 1 | | |
| 01.01b | Proactive Approach to Protect Against Liability: Policies and Procedures | DeLand | 2/1 | 11/06/20 | weber county |
| 01.01c | Proactive Approach to Protect Against Liability: Training | DeLand | 1 | | |
| 01.01d | Proactive Approach to Protect Against Liability: Supervision | DeLand | 2/1 | 06/12/17 | unknown |
| 01.01e | Prison Litigation Reform Act (PLRA) | DeLand | 2/1 | 11/06/20 | weber county DACOTA |
| 01.02a | Utah Jail Standards and Inspections | DeLand | 1 | | |
| 01.02b | AARMS Jail Audit System | McCotter | 1 | 11/06/20 | weber county |
| 01.03a | Preparing for Inmate Litigation: Collection of Materials | Hamilton | 1 | | |
| 01.04b | Preparing for Inmate Litigation: Preparing for Depositions and Trial | Hamilton | 2/1 | 06/13/17 | unknown |
| | **02 CORRECTIONS LAW** | | 6 | | |
| 02.01a | Introduction to Corrections Law: Evolution | DeLand | 1 | | |
| 02.01b | Introduction to Corrections Law: Sources of Rights | DeLand | 1 | | |
| 02.01c | Introduction to Corrections Law: Overview of Constitutional Issues | DeLand | 1 | | |
| 02.02a | Prison Rape Elimination Act (PREA): Legal Authority of Act and Standards | McCotter | 1 | | DACOTA |
| 02.02b | Prison Rape Elimination Act (PREA): Evaluating Key Provisions | DeLand | 2 | 02/28/17 | unknown |
| | **03 INMATE MANAGEMENT** | | 34 | | |
| 03.01a | Intake | Chipp | 1 | | DACOTA |
| 03.01b | Release | Chipp | 1 | | DACOTA |
| 03.01c | Clothing & Property | Chipp | 1 | | |
| 03.01d | Inventory, Receipt & Property | Chipp | 1 | | |
| 03.02a | Classification: Purpose and Function | DeLand | 1 | | DACOTA |
| 03.02b | Classification: Classification Criteria | DeLand | 1 | | DACOTA |
| 03.02c | Classification: Process | DeLand | 1 | | DACOTA |
| 03.02SP | Classification: Advanced (for Classification Officers) | DeLand 10 | 8 | 05/23/17 | unknown |
| 03.03a | Inmate Discipline: Purpose and Function | DeLand | 2/1 | 05/30/19 | DACOTA / unknown |
| 03.03b | Inmate Discipline: Initiating Action | DeLand | 2/1 | 05/30/19 | DACOTA / unknown |
| 03.03c | Inmate Discipline: Due Process Requirements | DeLand | 2/1 | 05/30/19 | DACOTA / unknown |
| 03.03d | Inmate Discipline: Imposing Penalties | DeLand | 2/1 | 05/30/19 | DACOTA / unknown |
| 03.03SP | Inmate Discipline: Advanced (IDHO for officers) | M.Ke | 8 | 05/31/19 | SLC County |
| 03.04a | Inmate Grievance: Purpose and Function | DeLand | 1 | | DACOTA |
| 03.04b | Inmate Grievance: PLRA and Exhaustion of Administrative Remedies | DeLand | 1 | | |

# EXHIBIT U

DUCHESNE COUNTY CORRECTIONAL FACILITY

POLICIES AND PROCEDURES

Standard D

PRISONER MANAGEMENT

Issue Date:

Latest Revision Date: 7/3/08; 5/11/10

Reference:

D 05.00.00 GRIEVANCE

D 05.01.00 WRITTEN POLICIES AND PROCEDURES

D 05.01.01 Policy and Procedure Directives Required

The Duchesne County Jail has written policies and procedures which provide the

requirements for, and elements of, a prisoner grievance process.

Rationale

Written policies and procedures are necessary to ensure that staff members

understand the purpose, function, and elements of the prisoner grievance system.

D 05.01.02 Content

The prisoner grievance directive should include, but not be limited to:

A. The purpose of the grievance system;

B. Procedures for filing grievances;

C. Matters which cannot be grieved because there are other available

administrative remedies (e.g., disciplinary appeals, classification challenges);

D. Other matters which cannot be grieved (e.g., Board of Pardon's decisions; Utah

State Prison policies, procedures, and actions; matters over which jail officials

have no authority or control).

E. Emergency Grievances;

F. Retaliation against inmates for filing grievances strictly prohibited; and

G. The requirement that inmates exhaust their administrative remedies before for alleged inmate rights violations.

Rationale. In addition to understanding the procedures required to process grievances, it is very important that staff understand the purposes of the inmate grievance system. There is often a misconception that the grievance system benefits only the inmates in the facility and puts staff on the defensive for their good-faith actions. If staff fully understands the purpose of the grievance system and how it directly benefits jail officials, there is a much greater likelihood that it will be properly utilized.

D 05.02.00 GRIEVANCE PROCESS

D 05.02.01 Function

The jail has implemented a grievance system which:

A. Affords prisoners a formal process to address complaints and other concerns; and

B. Can be used by the Jail Commander to identify operational dysfunction, prisoner frustration, and other management problems.

Rationale

It is not realistic to believe that prisoners will be happy or satisfied while being incarcerated in jail. The very purpose of which is to control their behavior and deprive them of liberty. However, prisoner's frustration and anxiety, a natural byproduct of incarceration, can be moderated if there is a system to channel the anxiety and anger to an acceptable forum. Prisoner grievance systems are intended to fulfill that purpose.

A. No Right to a Grievance System

Inmates have no constitutional or statutory entitlement to a grievance

system. Failure of a jail to adopt or adhere to an administrative grievance procedure shall not constitute the basis for legal action.2

B. Grievance System Benefits Jail Officials

Jail officials greatly benefit by providing an inmate grievance system, because the grievance process provides:

1. A constructive means through which inmates can complain and challenge the conditions of their confinement and the actions of staff;

2. A safety valve for inmates' frustration and anxiety;

3. Documentation of the inmate's complaints and the efforts of jail officials to resolve them;

4. A means of screening inmates complaints to allow staff the opportunity to resolve problems to avoid litigation; and

5. In the event of litigation the grievance filed by the inmate locks any future litigation into only the issues that were grieved and exhausted through the formal grievance system.

C. Jail Management Benefits

Properly operated, the grievance system can also provide information from which the Jail Commander can evaluate the operational climate of the jail, defend litigation and discover operational problem areas. Documentation generated by the grievance system provides:

1. A record of the good-faith efforts of jail officials in attempting to address the legitimate concerns of inmates;

2. A record of unreasonable complaints and demands of inmates; and

3. Information which can be used to defend the jail in the event of litigation.

A. Requires inmates to submit their grievances in written form;

B. Provides clear and unambiguous procedures for inmates to file and pursue grievances and for staff to process and resolve grievances;

C. Procedures should clearly set forth all of the steps which must be taken by inmates at each level of the process and clearly set time lines; and

D. Provide administrative review.

D 05.02.02 Resolution at Lowest Level

The jail has adopted and implemented a Grievance Policy which requires the first level of response to prisoner's grievances to be at the Line Officer level.

A. Line staff will document how the matter was handled, what was done to attempt to resolve the matter, and the disposition; and

B. Jail supervisors should counsel with staff members in those situations where a grievance should have been resolved at the first level

Rationale

Many, if not a majority, of the issues which prisoners grieve involve their interaction with staff members. Attempting to resolve grievances at the lowest perational level between line Corrections Officers and prisoners requires staff members to be a part of the solution rather than having the Jail Commander referee staff-prisoner conflicts. Matters which cannot be resolved at the lowest level can be handled at the highest level.

D 05.02.03 Scope of Grievance Process

The Grievance System is used as a means of receiving, processing, and resolving prisoner complaints including, but not limited to, those involving policies, procedures, practices, regulations, conditions, and staff conduct. In general, all prisoner complaints should be grievable except complaints against:

A. Decisions and procedures of the Board of Pardons and Parole, Utah

Department of Corrections, or other outside entities;

B. Disciplinary actions; and

C. Classification assignments.

Rationale

Providing prisoners the opportunity to grieve in each of those areas can provide the Jail Administration with an opportunity to resolve the matter without litigation. Those are also areas that cause the greatest concern and a quick resolution may be possible which will reduce the frustration and anxiety which for some prisoners prompt litigation. Classification challenges and disciplinary appeals should be dealt with separate from the grievance system.

D 05.02.04 Emergency Grievances

The grievance process provides an expedited process for those grievances of an exigent nature requiring faster processing than would occur with routine processing of a grievance.

Rationale

The grievance system is a deliberate, sometimes time consuming process. Certain prisoner problems or complaints may need to receive emergency or, at least, expedited handling. For example, it may be necessary to give emergency status and fast-track processing to grievances involving:

A. Medical treatment;

B. Fire and life-safety complaints;

C. Claims concerning missed release dates; and

D. Other matters for which delay would significantly prejudice the prisoner.

D 05.02.05 Retaliation Prohibited

Policy

It is the policy of DCJ that:

Retaliation against prisoners for using the Grievance System is prohibited.

Rationale

Retaliation against prisoners for filing grievances is prohibited because retaliation:

A. May create a cause of action for violation of the prisoner's Civil Rights, even if what is done in retaliation would not, by itself, be an unconstitutional act; and

B. Would reduce the willingness of prisoners to use the grievance system to resolve problems which would be contrary to the interests of the jail.

Purpose:

This policy will detail the grievance procedure and processes available to prisoners incarcerated in the Duchesne County Jail.

Definitions

Designated GrievanceOfficer The Corrections Officer designated to receive grievances from prisoners. In cases where the prisoner asserts allegations against the designated Grievance Officer, the prisoner should direct grievances to the Sergeant.

Emergency Grievance. A grievance which raises an immediate issue of safety, security, or health of any person such as an emergency medical condition, serious threat of bodily harm, facility conditions which pose a fire or health risk, serious security threat, or other matters which would significantly prejudice the prisoner.

Notice Information reasonably calculated to inform prisoners regarding some material aspect of the grievance process that is sufficient to allow prisoners to

fully exercise all of their procedural administrative remedies.

Prisoner Any person in the physical or legal custody of the county pursuant to an arrest, detention, awaiting sentencing, or serving a sentence for any crime.

Repetitive or

Similar Claims Repetitive or similar claims are claims that arise out of the same, or substantially the same, circumstances or facts. An example of a repetitive or similar claim would be complaints about conditions that have already been addressed in response to prior complaints.

Reviewing Officer An officer designated by the Jail Commander to conduct a Level II Review. The Jail Commander can assign a designated review officer to conduct a Level II Review, provided that the officer has not served as the designated Review Officer on the same complaint or another complaint arising out of the same circumstances.

05.02.06 Procedural Process

Policy

It is the policy of DCJ that:

A.. This grievance procedure will provide a basic procedural process to all prisoners in the physical or legal custody of the County Jail. This policy does not allow grievances on matters concerning discipline or classification of prisoners.

1. Prisoners appealing disciplinary actions should follow the appropriate Duchesne County Jail procedures for appealing disciplinary actions.

2. Prisoners with complaints regarding jail classification decisions may be referred to the Classification Officer.

B. All prisoners are permitted, by policy, to file a grievance on any nondisciplinary matter of concern arising out of their physical or legal custody

within the county, including, but not limited to, property claims, condition

of confinement claims, and Civil Rights claims. Prisoners may not file

grievances on behalf of third parties or on matters that do not directly

relate to the prisoner's custody or property. Prisoners are permitted to file

grievances pertaining to unlawful incarceration beyond the prisoner's

authorized release date only when Duchesne County has the authority to

release the prisoner. Prisoners are not permitted to file grievances on any

matter arising out of issues outside the control of the jail, such as decisions

of the Utah State Board of Pardons, the Utah Department of Corrections,

or judicial decisions pertaining to the prisoner's confinement. While

prisoners may file a grievance pertaining to the acts of employees against

the prisoner, prisoners cannot file a grievance pertaining to the

employment, discipline, or lack thereof, of any employee of the jail.

1. All grievances must be filed on an individual basis by the

respective inmate identifying the specific nature of the grievance.

2. Access to available administrative sources, particularly for

offenders requiring help in language interpretation or for impaired

or disabled inmates, is available through the line staff or

supervisors.

3. Inmates with complaints regarding Board of Pardons decisions

may be referred to the Board of Pardons.

4. Inmates with complaints regarding Utah Department of

Corrections may be referred to the Utah Department of

Corrections.

C. All grievances should be handled in an expeditious manner in accordance with principles that promote fairness and impartiality.

D. Prisoners will not be retaliated against for filing a grievance under this policy.

Rationale

A. Prisoners with legitimate complaints or problems should have a fair process to resolve disputes prior to resorting to litigation as envisioned by Section 803 of the Prison Litigation Reform Act, 42 U.S.C. § 1997a.

B. A fair grievance procedure is an important management tool, allowing the jail to identify and correct deficiencies and problems in an expeditious fashion.

C. A clearly written grievance procedure promotes just and consistent results and lends reliability and credibility upon which both staff and prisoners can rely.

Procedure: Requirement to Exhaust Administrative Remedies

A. Prisoners are required to exhaust their administrative remedies before they can file suit against jails or other County Officials for alleged violations of federally protected prisoner rights.

Rationale

The Prison Litigation Reform Act (PLRA) requires, "no action shall be brought with respect to prison conditions under Section 1983 of this Title, or any other Federal Law, by a prisoner confined in any jail, prison, or other Correctional Facility until such administrative remedies as are available are exhausted."

Procedure: General

A. Burden of Proof

The burden of proof shall be with the prisoner making the allegation or complaint.

B. Posting

This directive shall be made available to all prisoners upon request. All prisoners shall be notified of their remedies under this Grievance Policy upon intake or as soon as reasonably possible thereafter.

1. New inmates may receive orientation on the grievance procedure upon arrival at the jail. Thereafter, inmates may request the line staff or supervisors to help them review current procedures, obtain necessary forms, or receive instructions on the operation of the grievance procedure.

a. Additionally, DCJ Inmate Policy Manuals will be provided in each block as a reference source for inmates.

2. Access to available administrative sources, particularly for offenders requiring help in language interpretation or for impaired or disabled inmates, is available through the line staff or supervisors.

C. Time for Filing

Prisoners must file written grievances using the Kiosk machine located in each housing unit with the designated Grievance Officer within 14 calendar days of when the facts giving rise to a grievance are reasonably made known to the prisoner, or which the prisoner should have known.

D. Place of Filing

All grievances shall be filed in the following manner:

1. Grievance forms may be made available to inmates through the

Kiosk machines under the heading "Grievance". Kiosk machines

are located in each housing unit;

2. The prisoner will place submit the grievance using the Kiosk

machine. Kiosk machines are located on each section; and

3. A response/reply to the grievance will be available to the inmate

using the Kiosk machine and a copy placed in their file.

E. Contents of Grievance

The prisoner shall address grievances to the designated Grievance Officer

using the Kiosk machine. The grievance should briefly state the subject of

the complaint followed by supporting facts. All relevant information,

including names of witnesses and any necessary documents, should be

listed and attached if possible.

F. Records Classification

All grievances should be classified as private and protected under the

Government Records Access and Management Act (GRAMA), Utah Code

§§ 63-2-101, et seq. The contents should not be disclosed or released to

other prisoners or the public, except as necessary in the course of the

investigation on a need-to-know basis, or in the process of resolving the

grievance. The contents may be disclosed however, to further legitimate

penological interests, in response to a State Court Order, or in response to

a Federal Subpoena.

G. Assistance in Filing

Although prisoners do not have a right to legal or other assistance in filing

a grievance, a prisoner who cannot communicate by reason of disability,

language barrier, or any other reason should be afforded assistance to

enable the grievance to be reasonably articulated. In no instance however, should jail staff censor grievances.

1. Line staff and line supervisors may assist the inmates in obtaining access to, and an understanding of, the grievance process.

D 05.02.07 Grievance Process

A. Level I

Problems or concerns should be resolved, if possible, at the lowest level. Therefore, prisoners should attempt to address concerns with the appropriate officers and/or staff supervisors. If the prisoner does not feel that the response to the concern has been adequately addressed, the prisoner should then file a grievance with the designated Grievance Officer using the Kiosk machine.

Before utilizing the formal grievance process, all inmates must document efforts to resolve the grievance issue/issues on an informal basis.

The designated Grievance Officer should obtain all information necessary to respond to the grievance. The response should include recommendations to remedy the grievance or an explanation of why a remedy is unavailable or deemed unnecessary. The designated Grievance Officer should reply to the grievance within 14 working days of receiving the grievance.

Grievances may be answered by the Grievance Officer using the "Reply" portion of the grievance on the Kiosk machine.

If the grievance is not resolved, the prisoner may request a Level II Review of the grievance. All requests for a Level II Review must be submitted using the Kiosk machine and clearly state the reason(s) that the

response does not satisfactorily resolve the grievance. All requests for a Level II Review must be received by the Jail Commander/designee within 10 days of receipt by the prisoner of the response.

B. Level II Review

An officer designated by the Jail Commander, (Reviewing Officer), will conduct a review on the grievance when requested by the prisoner, using the Kiosk machine, within 10 days of the response.

1 The Reviewing Officer may obtain any information necessary to reach a decision.

2. The Reviewing Officer shall issue a decision to the Jail Commander within 10 working days. A reply to the Level II Grievance shall be made available to the prisoner using the Kiosk machine. The decision provided to the prisoner should not contain information that would jeopardize the security of the jail, jail staff, or that is contrary to legitimate penological interests.

3 The prisoner may file an appeal of the Reviewing Officer's decision with the Jail Commander within 10 days of receipt of the Level II Review written recommendation using the Kiosk machine. All appeals must be submitted using the Kiosk Machine and clearly state the reason(s) that the response does not satisfactorily resolve the grievance.

C. Level III: Appeals Process

1 The prisoner may file an appeal to the Jail Commander/designee within 10 days of being served with the Reviewing Officer's final decision by using the Kiosk machine. The Jail

Commander/designee shall review the process used and the recommendations made by the designated Grievance Officer and Reviewing Officer. The Jail Commander/designee shall respond to the appeal with a final decision within 10 working days.

2 The Jail Commander/designee may simply deny the appeal, remand for further proceedings, or issue a new and final decision.

3 The Jail Commander/designee is the final level of appeal.

D. Emergency Grievance

When a grievance is determined by supervisory-level staff to be an emergency grievance, the designated Grievance Officer shall render a preliminary decision within 24-hours, or as quickly as legitimate penological interests dictate to prevent bodily injury, grievous property loss, or any other grave injury. The designated Grievance Officer may take immediate steps to protect any person from threat of serious bodily harm. The appeals process may also be expedited as deemed necessary by the Jail Commander/designee.

D 05.02.08 Remedies

The designated Grievance Officer, Reviewing Officer, or Jail Commander/designee has the authority to recommend any remedy that will adequately make whole the prisoner who succeeds in his grievance including, but not limited to, reimbursement for actual losses. The designated Grievance Officer, Reviewing Officer, or Jail Commander/designee shall make a determination for the method of reimbursement, (i.e. replacement of the item, monetary compensation, etc.).

The grievance procedures do not set any limit on existing administrative

discretion or powers. The scope of available administrative remedies is broad and may be applied on a case-by-case basis.

Any time limitation in this policy may be extended by the Jail Commander/designee when exigent circumstances warrant such action.

The Jail Commander or supervisors should council with staff members in those situations where the Jail Commander has to resolve a grievance which is determined to have been capable of resolution at the first or lowest level.

D 05.02.09 Repetitive Or Similar Claims

In cases where the claim has been addressed before, the designated Grievance Officer, Reviewing Officer, or Jail Commander/designee may re-issue a prior decision addressing the claim. If the prior claim has been previously appealed to the Jail Commander/designee, the decision shall note that fact and advise the prisoner that there will be no further appeals allowed on the claim.

Malicious and frivolous grievances may subject the inmate to criminal, civil, or disciplinary action including assessment of restitution for incurred investigative costs.

Criminal, civil, or disciplinary action may not be initiated prior to the finalization of the administrative review process. If an inmate withdraws a grievance, the matter will be considered closed.

There may be an administrative review by the Sheriff on all malicious or frivolous allegations filed by inmates.

# EXHIBIT   V

# Duchesne County Jail
## Criminal Violations Screening

**Attach to MD1 and Report**

| Reporting Deputy: | M. Arias | Date: 07|25|2019 |
|---|---|---|
| Reported Crime(s) : | Assault by prisoner 76-5-102.5 | |

| | | |
|---|---|---|
| Last Name: Murphy | First Name: Anthony | Middle: |

| Jail Incident # 16031250 | Location: F Block dayroom | Time: 13:08 |

---

Bottom to be filled out by screening supervisor

Referred to Investigations (YES) or (NO)   Investigation Assigned: Deputy Arias

Screening Supervisor Signature: B~)    Date: 7/25/19

# EXHIBIT W

STEPHEN D. FOOTE #8945
**DUCHESNE COUNTY ATTORNEY**
GRANT H. CHARLES #10865
**DEPUTY DUCHESNE COUNTY ATTORNEY**
W. ANTHONY WILCOX #14029
**DEPUTY DUCHESNE COUNTY ATTORNEY**
Attorney for Plaintiff
P.O. Box 206
Duchesne, Utah 84021
(435) 738-0184

## IN THE EIGHTH DISTRICT COURT OF THE STATE OF UTAH

## DUCHESNE COUNTY, DUCHESNE DEPARTMENT

| THE STATE OF UTAH, | |
|---|---|
| Plaintiff, | **INFORMATION** |
| vs. | |
| | Case No. |
| **ANTHONY CHARLES MURPHY** | |
| DOB: | Judge   Samuel P. Chiara |
| Defendant. | DCSO 2019-000738 |

The undersigned Deputy Duchesne County Attorney, W. Anthony Wilcox, charges the defendant with the following crime(s):

### COUNT 1:

(crime)   **ASSAULT BY A PRISONER** (9)
(classification) **THIRD DEGREE FELONY**

AT: Duchesne County, State of Utah
ON OR ABOUT: July 25, 2019

IN VIOLATION OF: Section 76-5-102.5 UCA (1953) as amended

THE ACTS OF THE DEFENDANT CONSTITUTING THE CRIME WERE:
That at the time and place aforesaid, the defendant did , while being a prisoner, assault another with the intent to cause bodily injury.

This information is based on evidence obtained from witness(es), including: Megan Arias.

DATED this 30 July 2019.

By _/s/ W. Anthony Wilcox_
W. Anthony Wilcox
Deputy Duchesne County Attorney

# EXHIBIT X



EIGHTH DISTRICT COURT-DUCHESNE

DUCHESNE COUNTY, STATE OF UTAH

| STATE OF UTAH, | MINUTES |
|---|---|
| Plaintiff, | SENTENCE, JUDGMENT, COMMITMENT |
| | |
| vs. | Case No: 191800219 FS |
| ANTHONY CHARLES MURPHY, | Judge: SAMUEL P CHIARA |
| Defendant. | Date: May 18, 2020 |
| Custody: Utah State Prison - Draper | |

**PRESENT**

Clerk: michellr

Prosecutor: WILCOX, W ANTHONY

Defendant Present

The defendant is in the custody of the Department of Corrections Utah State Prison - Draper

Defendant's Attorney(s): MORRISON, GRANT W P

**DEFENDANT INFORMATION**

Date of birth:

Audio

Tape Number: Rm1 8.45.50 Tape Count: 8.52.53

**CHARGES**

1. ASSAULT - Class B Misdemeanor Plea: No Contest - Disposition: 05/18/2020 No Contest

**ARRAIGNMENT**

Defendant is arraigned.

Defendant waives time for sentence.

**HEARING**

Counsel states there is an agreement.  The Defendant will enter a guilty plea to count 1.  The Defendant is advised of his rights. The Defendant enters a no contest plea to count 1;  reduced to a Class B Misdemeanor.  A factual basis is given by the State and the Defendant admits to the facts. The Court accepts the plea, finding the Defendant has entered it knowingly and voluntarily, and orders it to be made of record. Defendant waives time for sentencing.  Statements were made by counsel. NOW THEREFORE, based upon the file and record herein, it is hereby ORDERED, ADJUDGED AND DECREED as follows: That the Defendant has been convicted by his own guilty

plea. The following sentence will be imposed.

**SENTENCE JAIL**

Based on the defendant's conviction of ASSAULT a Class B Misdemeanor, the defendant is sentenced to a term of 6 month(s)
Credit is granted for time served.

**SENTENCE JAIL SERVICE NOTE**

The defendant may serve jail time at the state prison.

**CUSTODY**

The defendant is remanded to the custody of the Department of Corrections Utah State Prison - Draper.

**End Of Order - Signature at the Top of the First Page**

## CERTIFICATE OF NOTIFICATION

I certify that a copy of the attached document was sent to the following people for case 191800219 by the method and on the date specified.

EMAIL: RECORDS UTAH STATE PRISON udc-records@utah.gov

EMAIL: GRANT CHARLES ATTORNEYS@DUCHESNE.UTAH.GOV

EMAIL: GRANT W P MORRISON GWPMORRISON@GMAIL.COM

EMAIL: W ANTHONY WILCOX AWILCOX@DUCHESNE.UTAH.GOV

05/20/20          /s/ MICHELLE RIOS

Date: _____          _____

Signature